UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES,                          )
                                        )
                    PLAINTIFF           )   Criminal Action
                                        )
        -VS-                            )   No. 10-10233-NG
                                        )
JOHNNY WATKINS,                         )   May 24, 2011
                                        )
                                        )   2:18 p.m.
                    DEFENDANT           )

SENTENCING HEARING

BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210

VALERIE A. O'HARA
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
1 COURTHOUSE WAY, COURTROOM 3204
BOSTON, MA  02210
E-mail:  vaohara@gmail.com

1    A P P E A R A N C E S:

2    FOR THE UNITED STATES:

3        United States Attorney's Office, by KENNETH G. SHINE,
     ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way,
4    Suite 9200, Boston, Massachusetts  02110;

5    FOR THE DEFENDANT:

6        Federal Defender's Office, by CATHERINE K. BYRNE,
     ATTORNEY, 51 Sleeper Street, Boston, Massachusetts  02210.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  You can be seated.

4            THE CLERK:  This is Criminal Matter 10-10233,

5   United States vs. Johnny Watkins.  Will counsel please

6   identify themselves for the record.

7            MR. SHINE:  Your Honor, good afternoon,

8   Kenneth Shine.  I appear on behalf of the United States

9   Government.

10           MS. BYRNE:  Your Honor, Katherine Byrne

11  representing Johnny Watkins.

12           THE COURT:  Mr. Watkins, would you please stand.

13           (Defendant was sworn)

14           THE COURT:  Mr. Watkins, have you read the

15  pre-sentence report?

16           THE DEFENDANT:  Yes, ma'am.

17           THE COURT:  Okay.  Are there any changes you want

18  to make other than those your lawyer has already made?

19           THE DEFENDANT:  No, ma'am.

20           THE COURT:  Okay.  You can be seated.  Mr. Shine,

21  have you had an opportunity to see the video?

22           MR. SHINE:  I did, your Honor, I received it

23  yesterday, and I had a chance to look at it, and I received

24  the packet this morning, 11:00, sentencing memorandum, which

25  I have had a chance to.
```

1          THE COURT:  You have had a chance to?

2          MR. SHINE:  Of course, I have.  I did not have

3    lunch, I made sure I read it.

4          THE COURT:  Me, too.  Your recommendation is?

5          MR. SHINE:  Well, it's a tough one, your Honor,

6    and I'm struggling with this recommendation.  Mr. Watkins is

7    63, 64 years old.  He has what I would suggest would be one

8    of those records that you step back in your career and just

9    say, whoa, I mean, clearly he has had four, this would be

10   his fourth federal case.

11          He's been convicted numerous times:  Bank robbery;

12   mail theft; strong arm robberies; armed robbery in '66;

13   armed robbery again; federal mail theft, '72; armed bank

14   robbery, '73; federal bank robbery while he was on parole on

15   the '73 one in '78; he paroled, he was sent back because he

16   violated because of a strong arm robbery.  I want to be

17   optimistic for you, I really do.  I want to say that I think

18   that maybe now he gets it, I just don't know.

19          For the last 30 years, Mr. Watkins has been in

20   custody off and on for various different cases in this state

21   and federal cases and throughout.  This was another bank

22   robbery.  It was not in the realm of the bank robberies that

23   we see the most egregious matter, he walked in, he

24   approached the teller, he demanded money, he received $863.

25   It wasn't a lot of money, I admit to that.  Of course

1    because that's all there was in the drawer, if it was

2    $10,000 in the drawer, he would have received $10,000, and

3    he left the bank.

4           THE COURT:  What about the fact that he hasn't

5    committed any crimes between '93 and 2010?

6           MR. SHINE:  I do, I gave him credit for that, I

7    give him credit.  You took a chance on him, I wouldn't have,

8    but you did, and I defer to your wisdom and judgment, that

9    since October of last year he has been out on release when

10   our office absolutely, we were not interested in releasing

11   him.

12          There's two aspects, there's many aspects of the

13   sentencing.  One aspect we have to consider is some sort of

14   punitive aspect.  He has done these offenses, he's gone to

15   jail, he said he's sorry, he goes back, and he does it again

16   and again and again.  At what point do we say enough is

17   enough?  At 64 years old, he's out robbing banks again.

18   Now, clearly he was having some issues at that time, his

19   sobriety, and I watched the video, and I've listened to some

20   of these people I'm sure that are in court today were some

21   of the people on the video saying that, you know, he's got

22   some expectation, and I really think, you know, you look in

23   the direction people are heading, I just don't know what to

24   recommend.

25          There are tellers who were at this bank who had to

1  interact with Mr. Watkins.  That's not fair to them.  My mom

2  goes to this bank sometimes, that's not fair to her, that

3  they have to interact with somebody.  Mr. Watkins left,

4  there could have been more incidents that could have

5  happened.  There's got to be a general deterrence.  He's

6  starting to turn his life around.  I was very sympathetic to

7  his wife's concerns, which was obvious in that video, but

8  there's got to be some punitive aspect to this, there's got

9  to be something that says to society, you know, a

10  sixth-month penalty, which is like a misdemeanor is not

11  enough.

12        Now, with that in mind, the advisory guidelines

13  are decent, 37 months I believe the low end, and I have

14  every right to stand here and say that that's not

15  appropriate, I have every right to say to you that this

16  gentleman's record clearly understates his criminal history

17  and his criminal livelihood.  I won't do that.

18        My recommendation, your Honor, is this:  I've

19  asked the Court to impose a nonguideline sentence of 30

20  months' incarceration.  It would be followed by three years

21  of supervised release.  Mr. Watkins is not in a position to

22  pay any type of fine, the mandatory $100 special assessment

23  and restitution, and I believe it's in the amount of $830 --

24        THE COURT:  $983 is what I have, is that right?

25        MR. SHINE:  Yes, your Honor, I apologize.  I think

1    the 30 months is a substantial sentence.  It's a lengthy

2    sentence for him.  I know it will impact other people

3    including Mr. Watkins family, and I'm sorry for that, but

4    they're not the ones that has been committing these crimes,

5    Mr. Watkins has, and I believe that number is a decent

6    number or at some substantial portion of that incarceration.

7    Thank you, your Honor, very much.

8              THE COURT:  Thank you, Mr. Shine.  Ms. Byrne?

9              MS. BYRNE:  Yes, your Honor.

10             THE COURT:  How do you address the punitive, that

11   there has to be some punishment here?

12             MS. BYRNE:  Right.  I respect that, and I

13   understand that, your Honor, but I do think that in this

14   case that six months is a significant period of time, and I

15   can tell you that the six months that Mr. Watkins spent in

16   custody on this case was probably the most difficult period

17   of time that he's ever spent in custody because his wife was

18   ill, he was unable to attend, to help her and attend to her

19   needs, which is something that he's basically been by her

20   side since 1989, and he couldn't help her, and he knew she

21   needed it.

22             They are of very limited means.  She wasn't able

23   to make her way even to visit her during the whole time he

24   was there.  She couldn't see him.  They couldn't see each

25   other.  They communicated by letters, and so that was a

1    really difficult time.

2           THE COURT:  Is there someone to care for her if

3    he's in prison?

4           MS. BYRNE:  She does have a son, however, he has

5    issues of his own in his own life and is not the person that

6    takes care of her and takes her to her medical appointments

7    and to go to the doctor with her and talk to the doctor and

8    understand what her medical condition is and things like

9    that, so I would say, you know, in the worst case scenario,

10   I'm sure that her son would come through her if he can.

11   Unfortunately he's been in jail some of the time.  I don't

12   think that he is the most reliable person for her, and

13   Johnny Watkins has been the one who's been kind of

14   interacting with the doctors and explains what's going on

15   with her.

16          THE COURT:  I saw that during the video

17   Ms. Watkins says that she forgets, he's the one who

18   remembers what to ask the doctor.

19          MS. BYRNE:  Right.  Today, actually, we were just

20   talking before we came in to see you, and I was telling

21   them, you know, what I was going to say to your Honor and

22   what was in the sentencing memo, and I said to her, well,

23   I'm going to tell the Judge that you struggle with cancer

24   and with kidney disease, and she said, "I don't have kidney

25   disease."  And I said, "Well, yes, I think you do have

1   kidney disease," and he said, "Yes, you have kidney

2   disease," and it's all over her medical record that she has

3   significant renal failure along with severe depressive

4   disorder, and so I think that in terms of her medication and

5   in terms of understanding what's going on with the doctor,

6   she doesn't always get as good a grasp of what's happening

7   as her husband does, and he really helps her in that way as

8   well.

9           THE COURT:  Who is in court today?

10          MS. BYRNE:  In court today, your Honor, we have,

11  well, Gloria is sitting in the middle with the black leather

12  jacket on, and next to Gloria are Al and Larry and Paul, and

13  they are.

14          THE COURT:  AA?

15          MS. BYRNE:  Recovery AA supporters.

16          THE COURT:  One of you was in the video?

17          MS. BYRNE:  That's actually Larry, and he was not

18  able to be here today.  Larry is Mr. Watkins' sponsor, and

19  actually I was just telling Mr. Watkins he really could be

20  an advertiser for AA.  He's a big supporter.

21          THE COURT:  I saw that.

22          MS. BYRNE:  Actually Christine Consoli, I don't

23  know if you know Christine or Elisa Hutton, they're actually

24  in the Federal Defender's Office, and they actually made the

25  sentencing video, so they're here.

1        THE COURT:  Anyone from the bank here, Mr. Shine?

2        MR. SHINE:  No, your Honor, I advised them to

3    come.  They asked me to express their concerns obviously,

4    and I just before Ms. Byrne ends, I misspoke, and I need to

5    correct that when I made my recommendation, I originally

6    asked for 30 months, and I'm asking for 25 months.  I

7    apologize to the Court, I miscalculated, my recommendation

8    should have been 25 months.  I'm not changing because

9    Ms. Byrne is so convincing, although I'm sure she is.  My

10   number was 25 months, that's what I wanted to give you, so I

11   apologize.

12       THE COURT:  Go on.  Do you want to play the video?

13   I've seen it.  Do you want to take the time to play it?

14       MS. BYRNE:  It's up to you, your Honor.  If you

15   have seen it, I don't feel the need to play it again.  It's

16   mostly because I wanted you to see it, of course.  I really

17   don't need to go on.  I know you've read my sentencing

18   memorandum.  The primary arguments are that Mr. Watkins is

19   the primary caretaker of his wife, that she will truly

20   suffer, I believe, if he is not there to help her.  I think

21   that her --

22       THE COURT:  There's a period from '93 to 2007 when

23   Mr. Watkins maintained sobriety.

24       MS. BYRNE:  Right.

25       THE COURT:  Then in 2007 he lost his job and had

1    to begin to care.  That was when his wife was first

2    diagnosed with cancer?

3           MS. BYRNE:  Right, around that time.

4           THE COURT:  Why should we believe that the

5    stresses of taking care of his wife won't or heaven forbid

6    something else happened, why should we believe that that

7    won't set him off again?

8           MS. BYRNE:  Right.  I think that's a reasonable

9    question, and I think that he probably should address you on

10   that when he does have his chance to speak to you as well,

11   but I think that he really found his way through the AA

12   fellowship.

13          What happened was he stopped going, and he did

14   have a series of things that happened.  It wasn't just that

15   his wife became ill with cancer, it was he lost his job and

16   then soon after that they had a fire, they lost everything.

17   Their house basically burnt down, they lost everything, and

18   they had to start over, and so it was a lot of things.

19          That's not an excuse, your Honor, I mean, that's

20   not a good excuse for going out and robbing a bank, but he

21   certainly wouldn't have done it if he weren't using drugs or

22   alcohol at the time, and because everything you see about

23   him is that he's a very moral person, he's a very kind

24   person.  He's the one that goes over to the newcomers in AA

25   and gives them hope and support.

1    People love this man, and the things he's done in

2  his life, the kinds of work he does, he's a very generous

3  person, he's just a different person when he's using alcohol

4  and drugs, so I guess the thing is my real argument, your

5  Honor, is that to send him to interrupt with -- no one can

6  say for sure that he's never going to slip again and he's

7  not going to commit another crime.

8    I can't tell you that for sure obviously, but what

9  I can tell you is that sending him to prison and

10  interrupting the program that he has himself in now is not

11  going to be the best thing for society and for Mr. Watkins

12  because what he has now is the best hope that he will not

13  ever revert to the use of drugs or alcohol and commit any

14  more crimes because he's on a good path, and he intends to

15  stay on that path not because you make him do that, but

16  because that's what he wants to do.

17    He did that for 17 years when he wasn't on parole,

18  he did that because that's the life he really wants to lead,

19  and he wants to be there for his wife.  The worst thing that

20  ever happened was that six months that he was away from her

21  and he was afraid he was going to lose her.

22    We don't know what her prognosis is at this point,

23  but he hopes to be there for her and hopes to lead a

24  productive life for the rest of his life, your Honor, and if

25  you have any other questions, I could address those or you

1   could hear from Mr. Watkins.

2       THE COURT:  Mr. Watkins, I'd like to hear from

3   you.  I'd like you to answer the question about if over the

4   next few years the situation with your wife deteriorates, if

5   it gets harder, what are the chances, nobody can give me

6   assurances, that you won't go back to drinking?

7       THE DEFENDANT:  Your Honor, I'd like to say in the

8   program, you know they said, you know, if a person continued

9   to go to meetings, there's no chance at all that they

10   relapse, and that's what happened to me back in 2007, you

11   know, I got a little complacent, and I got away from the

12   meetings, but that's something that I would never, never do

13   again, and I'm very, very grateful that you believed in me

14   enough to give me the opportunity to be with my wife during

15   this major operation she just had about three months ago.

16       I will forever be grateful to you for that, you

17   know, for just believing in me enough to trust me enough to

18   give me an opportunity to do that.  You know, I just can't,

19   I'll always be in your debt, but to me, you know, as far as

20   whether I will ever relapse again, nobody can never say

21   never, but I do know if I continue to do what I'm doing and

22   what I used to do, you know, when I got the 17 years or more

23   of staying clean was going to meetings, and like I said, I

24   got a little complacent, and I kind of got away from the

25   meetings, and once that happened, you know, I made a mistake

1    that I see, you know, where I made a mistake at, and once I

2    got in my head, I made a big mistake, but I never intend to

3    put anything in my body again to clog my mind up to make me

4    make a mistake like that again.

5              Like Ms. Byrne just said, when I was confined in

6    Wyatt Detention Center in Rhode Island, I felt like I was

7    going insane because I really love my wife and I was really

8    worried about her.

9              THE COURT:  Do you in fact talk too much?  She

10   said on the video that you talk too much?

11             THE DEFENDANT:  Okay.  Well, I just thank you for

12   everything, and I thank my lawyer, you know, I'm just

13   grateful that people believe in me, and no matter what the

14   decision, I'm glad that people believe in me again.

15             THE COURT:  Thank you.  Let me take a few minutes.

16             THE CLERK:  All rise.

17             (A recess was taken.)

18             THE CLERK:  All rise.

19             THE COURT:  You can be seated.  First let me ask a

20   question about pretrial.  There was a problem on May 21st

21   which was just this past Saturday.

22             PRETRIAL OFFICER:  That's correct, Judge.  He was

23   scheduled out for an AA commitment from 6:00 to 8 p.m.  He

24   ended up leaving early and getting home late.

25             THE COURT:  Do you think it was anything at all?

1       THE DEFENDANT:  That the AA commitment is a good

2   distance from his house and he is relying upon others for

3   rides.

4       THE COURT:  Bank robbery is in one sense the most

5   difficult crime to sentence for because it's on the one hand

6   a very, very serious offense.  People get really -- tellers

7   are put in danger, people are really frightened, and we also

8   fear, we all fear walking into a bank and having that happen

9   when we're there.  By the same token, in my experience it's

10  not infrequent that the bank robbers, the defendants, are

11  people with monumental addictions, and so you have on the

12  one hand a crime whose cause, you know, you know the cause

13  of it and you know how to deal with it, and, on the other

14  hand, a very serious crime.

15      I appreciate the government's recommendation.  I

16  appreciate the thought that went into it.  I appreciate the

17  fact that the government is recommending a variance, and I

18  generally appreciate the time that Mr. Shine puts into all

19  of this.

20      I have to figure out how to say the next sentence.

21  I want to say that you are one of the U.S. attorneys that I

22  very much listen to, but that implies that there are others

23  that I do not, and I don't want to exactly say that, but

24  it's true that I know that care and thought and concern goes

25  into all of your recommendations, but I can't think of any

1     reason why Mr. Watkins should be returned to jail.  I can't

2     think of any reason.

3            As I said, this is a crime for which we know the

4     cause.  This is you drink, you do crime.  I was enormously

5     impressed in the line in the video in which you say that how

6     horrified you were at your behavior not just because of you

7     committed another crime but because it put at risk your

8     relationship with your wife at a time that she needed you

9     most and because, as you said, you become a less than

10    dignified person, you lose your dignity when you drink, and

11    I found that an enormously moving thing.  It's not just what

12    happens to you with others, but it's also that you become a

13    less than dignified person.

14           I don't think that anything other than time served

15    is necessary to accomplish the purposes of sentencing.  You

16    will not recidivate so long as the addiction is under

17    control.  We know -- this is not a prediction.  We know that

18    that happens.  For 20 years the addiction was under control.

19    This very bad record was undone, so public safety we know we

20    can deal with as long as your addiction, as long as your

21    alcohol is dealt with.

22           Will you be deterred from doing this kind of thing

23    again?  Yes, because you understand you get in trouble again

24    and you lose your access to your wife.  All the things that

25    you're doing now will go out the window if you get in

1   trouble again, and punishment, I appreciate the need for

2   punishment.  I very much appreciate the need for punishment,

3   but here the need for punishment is actually inconsistent

4   with all the other purposes of sentencing.  They collide.

5   Punishment commands one set of responses, but just about

6   every other purpose demands a different set of responses.  I

7   think I have a way of at least requesting the punishment

8   concerns to a degree.

9           There is no question that the guideline

10  computation is correct, which is a base offense level of 19,

11  and is it a criminal history of 2?  What's the criminal

12  history?

13          PROBATION OFFICER:  Yes, your Honor.

14          THE COURT:  Which led to 33 to 41 months.  I

15  believe that a departure in fact is warranted from that,

16  would be warranted pre-Booker, a departure based on

17  extraordinary family circumstances, and the extraordinary

18  family circumstances is outlined in the memo and in the

19  video which has to do with Mr. Watkins' relationship with

20  his wife.

21          The relationship is very touching.  Mr. Watkins

22  desperately wants to care for his wife.  His relationship

23  seems to be essential to her getting by and getting whatever

24  kind of treatment that she needs.  There's always a question

25  about whether the law on extraordinary family circumstances

1    after the Booker decision is the law that predated Booker or

2    the law afterwards.

3         It seems to me what we should be asking is not

4    just how this helps a third party but also the extent to

5    which Mr. Watkins' concern about his wife will keep him

6    under control so that family circumstances here bears on the

7    purposes of sentencing this individual as well as being

8    important for another human being, namely Mrs. Watkins.

9         I also believe that the concept of extraordinary

10   rehabilitation, which we used pre-Booker, also applies here

11   to justify this.  Mr. Watkins is doing fine now.  He has

12   support, he has a regime here, he has people who are caring

13   for him.  Putting him in jail and disrupting all of that

14   with all the consequences of that it seems to me is

15   inconsistent with his rehabilitation.

16        So, Mr. Watkins, would you please stand.  I'm

17   going to sentence you to time served, which is from 6-14-10

18   to 7-23-10 when you were detained in state custody for a

19   related offense and 7-23-10 to 12-14-10 when you were

20   detained in federal custody.  That's the time already served

21   is the time that you will be sentenced to.  Supervised

22   release for three years.  No fine.  Restitution in the

23   amount of $983 and a special assessment of $100.

24        On supervised release, you are, as I said, you're

25   supposed to make restitution in the amount of $983.  The

1    restitution is to begin immediately and shall be made

2    according to the requirements of probation.  Restitution

3    shall be made to the Sovereign Bank.  You're to tell the

4    U.S. attorneys of any change of mailing or residence

5    address.  You're not to commit another federal, state or

6    local crime.

7         You can't make this argument again, you understand

8    that.  You're to refrain from any unlawful use of a

9    controlled substance, submit to a drug test within 15 days

10   of today and at least two periodic drug tests thereafter.

11   You're to submit to the collection of a DNA sample, comply

12   with the standard conditions.  You're prohibited from

13   possessing a firearm or other dangerous weapon.  You're to

14   pay, as I said, the balance of the restitution.  You're

15   prohibited from incurring new credit charges without

16   probation's permission, provide probation with requested

17   financial information.  You're not to consume any alcoholic

18   beverage.

19        You're to participate in programs for substance

20   abuse counseling directed by probation which may include

21   testing.  You're to participate in a mental health treatment

22   program as directed by probation.  Probation will be careful

23   to make sure that whatever they recommend can be coordinated

24   with the AA obligations so that there are not too many

25   requirements being imposed on you.  Whatever they do will be

1    consistent with your AA requirements as well as taking care

2    of your wife.

3         I'm also going to require community service, 45

4    hours over the three years of your supervised release.  The

5    community service could be satisfied by your being a

6    counselor at AA in the way that you have been.  In one sense

7    the story that you tell to others is a story about how close

8    you came to ruining your life and not being there for your

9    wife when she most needed you, so it would be community

10   service for 45 hours over three years.

11        I said a special assessment of $100.  I don't

12   think this is an easy sentence, but I think it's a fair one.

13   You have a right to appeal, and your lawyer will let you

14   know what that consists of.  Do I need to address anything

15   else?

16        MR. SHINE:  You do, your Honor.  Two points, one,

17   there is a forfeiture allegation which you have to state in

18   open court.  There were some items of clothing, things of

19   that sort that were seized, so I'd seek forfeiture as the

20   indictment would so allege.

21        THE COURT:  Forfeiture, okay.  Do you have that in

22   writing?

23        MR. SHINE:  I do.  It's part of the indictment

24   there's a forfeiture allegation.

25        THE COURT:  Okay.

1    MR. SHINE:  The only other thing, and I'll push my

2    luck, 45 hours of community service I think is commendable.

3    I'd like it double.  I'm not happy with it at all, but I'm

4    thinking to myself an average 12-step program maybe if he

5    would just be responsible for following the class through,

6    45, he could do that in nine weeks.  It's nothing, but you

7    have to follow a class through would be a sponsor for 90

8    hours or 100 hours of community service work.

9    THE COURT:  Does that seem reasonable to you?

10   PROBATION OFFICER:  Yes, your Honor, if there's

11   some problem with that, the probation officer would approach

12   your Honor for some modification.

13   THE COURT:  We'll make that 90 hours.  I

14   appreciate that, and I take that and you're not waiving any

15   of your other substantial objections to this sentence, I

16   understand.

17   MR. SHINE:  Thank you, your Honor.

18   PROBATION OFFICER:  Your Honor, we would just ask

19   with respect to the substance abuse and the mental health

20   counseling that Mr. Watkins be required to contribute to the

21   payments if available or the third-party payment

22   availability as well.

23   THE COURT:  I forgot to say that.  Whatever

24   probation recommends in terms of drug counseling or mental

25   health treatment you may be required to contribute if you

1   have the ability to contribute or have third-party payors

2   pay that amount.  The forfeiture is in the indictment.  Do

3   you need a separate order for that, Mr. Shine, or can I just

4   adopt the forfeiture allegations in the indictment?

5         MR. SHINE:  You could adopt the forfeiture

6   allegations.  If something is necessary, our office will

7   bring it down, but this is what they've asked me to present.

8   Apparently under the new regs., you have to specifically

9   stay on the record for the forfeiture allegation.

10        THE COURT:  Does this have to be part of the

11  J & C, typically it is?

12        MR. SHINE:  It is.  If there's a specific thing

13  that's necessary, I will have that prepared and brought

14  down, but this should suffice.

15        THE COURT:  All right.  Mr. Watkins, you have a

16  right to appeal, and as I said, your lawyer will let you

17  know what that consists of.  I wish you lots of luck.

18        THE DEFENDANT:  Thank you, your Honor.

19        MR. SHINE:  Your Honor, thank you.

20        MS. BYRNE:  Thank you, your Honor.

21        THE CLERK:  All rise.

22        (Whereupon, the hearing was suspended at

23  3:02 p.m.)

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS     )

5    CITY OF BOSTON                )

6

7              I, Valerie A. O'Hara, Registered Professional

8    Reporter, do hereby certify that the foregoing transcript

9    was recorded by me stenographically at the time and place

10   aforesaid in No. 10-10233-NG, United States vs.

11   Johnny Watkins and thereafter by me reduced to typewriting

12   and is a true and accurate record of the proceedings.

13                         /S/ VALERIE A. O'HARA

14

15                    _____

16                    VALERIE A. O'HARA

17                    REGISTERED PROFESSIONAL REPORTER

18                    DATED JUNE 2, 2011

19                    _____

20

21              .

22

23

24

25